# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## CASE NO. 17-74-SMM

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**ALEKSANDRS MUKANS,**

    Defendant.

_____/

## ORDER ON IDENTITY/REMOVAL EVIDENTIARY HEARING

THIS CAUSE having come on to be heard for an Identity/Removal Hearing before this Court on August 4, 2017, and this Court having received testimony, evidence, and argument, makes the following findings:

1.    The Defendant is presently charged in a Superseding Indictment pending in the United States District Court for the Southern District of New York. The Superseding Indictment charges Defendant with conspiracy to commit wire and bank fraud in violation of Title 18, United States Code, Section 1349 and conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956. This Court convened an evidentiary hearing in respect to the identity/removal of the Defendant to the Southern District of New York. This Court simultaneously received evidence concerning the government's request for detention. This Court will enter a separate Detention Order reciting the same facts and evidence received as it relates to detention.

2.    The attorney for the government proceeded by proffer, offering FBI Special Agent Neill Fagan for cross-examination. The government's attorney stated that the case

1

involves a fraudulent internet scheme conducted by a network of individuals located throughout the United States and overseas, specifically Latvia. Defendant and his co-conspirators targeted victims through the internet by posting fraudulent advertisements to sell boats or cars on Craigslist and other websites, when in fact there were no boats or cars to be sold. The co-conspirators sometimes used the names of real automobile dealerships to lend credibility to the postings. When prospective buyers responded, conspirators negotiated the purchase over email, often using email accounts set up in the names of real car dealerships. Co-conspirators provided bank wiring instructions to the buyers, many of whom wired funds into various bank accounts controlled by the conspirators. After payment was made, prospective buyers never received the vehicles or boats they had purchased. Victims typically did not realize they had been defrauded for several days, during which Defendant and his co-conspirators would withdraw the funds. The bank accounts involved were opened by individuals recruited from Baltic countries, such as Latvia, who traveled to the United States to open bank accounts in the names of fictitious companies and withdraw fraudulently obtained funds as soon as they were deposited. Once the money was withdrawn, it was sent back overseas.

3. According to the government, Defendant was recruited in Latvia to travel to the United States to participate in this scheme. He was promised a cut of the money that he withdrew. When Defendant arrived in the United States he immediately began opening bank accounts in the name of Gortion Corporation at multiple financial institutions including TD Bank, Wells Fargo, and J.P. Morgan Chase. On the account opening documents, he described Gortion Corporation as an online seller of upholstered furniture. Gortion Corporation, however, existed in name only, according to the prosecutor. It was not involved in any form of online business and did not have a physical location. Defendant also submitted a fake energy bill to the

bank to make his company appear to be real. According to the government, one victim wired $25,000 into an account controlled by Defendant, believing he was buying a car. Another victim wired $8,450 to an account controlled by the Defendant, believing he was purchasing a boat. Neither victim received what they paid for. On February 10, 2016, the Defendant received $25,000 in an account at Chase Bank in the name of Gortion Corporation. Defendant withdrew the money in six transactions. In March, 2016, Defendant received wire transfers into a TD Bank Account from victims which totaled approximately $58,000. Defendant withdrew all of the funds through a series of withdrawals and debits. In total, Defendant withdrew approximately $80,000 to $85,000 in fraudulently obtained funds.[1] The conspiracy in which he is charged is responsible for over $4 million in losses.

4. The government introduced four exhibits which were admitted without objection from defense counsel. Government's Exhibit 1 is a Latvian passport found in Defendant's pocket when he was arrested. The photograph on the passport depicts the Defendant. The name on the passport is ALEKSANDRS MUKANS. The government proffered that Government's Exhibit 1 was used by Defendant to gain entry into the United States in January 2016. It was also used by Defendant to open a personal bank account at Chase Bank, which was then used to open a business checking account in the name of Gortion Corporation. The business account in the name of Gortion Corporation was used to receive fraudulent funds.

5. Government's Exhibit 2 is a record from Chase Bank for a personal checking account opened in the name of ALEKSANDRS MUKANS in January 2016. The account

---

[1] The attorney for the government initially proffered that Defendant was responsible for $100,000 in loss. On cross-examination, Special Agent Fagan clarified that to his knowledge the number was between $80,000 and $85,000.

number ends in 9799. Government's Exhibit 2 shows the account was opened using the Latvian passport in Government's Exhibit 1.

6. Government's Exhibit 3 is a record from Chase Bank for a business checking account opened in the name of Gortion Corporation on February 3, 2016. The account number ends in 5075. The account was opened and signed for by ALEKSANDRS MUKANS. This Court compared the signature for the business account ending in 5075 with the signature for the checking account ending in 9799, and notes that the signatures are the same. Exhibit 3 also shows a transfer from the business account ending in 5075 to the personal account ending in 9799, further indicating that the accounts belonged to the same person. Lastly, Exhibit 3 shows a $25,000 transfer into the business account on February 10, 2017, which the government described as funds obtained fraudulently as part of the scheme.

7. Government's Exhibit 4 is a copy of two identification documents found in Defendant's possession when he was arrested. The first is a Lithuanian identification with Defendant's picture on it in the name of Mickus Kostas. It lists Defendant's birthday as 7/5/1966. The second is a Latvian identification with Defendant's picture on it in the name of ALEKSANDRS MUKANS. The Latvian identification lists Defendant's date of birth as 7/5/1973.

8. The government's attorney also proffered that Defendant often accompanied co-conspirators when withdrawing funds from bank accounts used for the fraudulent scheme. The government's attorney discussed, but did not introduce, an ATM surveillance video photograph where Defendant is with a co-conspirator, who is purportedly withdrawing fraudulent funds from an account.

9. Defense counsel cross examined FBI Special Agent Neill Fagan, who traveled from New York to testify at the hearing. Special Agent Fagan testified that he is not the case agent and was not involved in the underlying investigation. He was contacted by the case agent and briefed on the case in order to testify for the hearing. Agent Fagan stated that he has reviewed the evidence against Defendant, including the case file, bank records, documents and Customs and Border Protection records.

10. On cross-examination, Agent Fagan testified that Defendant opened accounts in the name of Gortion Corporation at various banks, including Chase, Wells Fargo[2] and TD Bank, and used his true identity in opening these accounts. Agent Fagan did not know whether Defendant had ever lived at the New York address listed on the bank accounts, and had no reason to believe that the email address listed on the bank accounts was fraudulent. The Latvian passport Defendant used to open the bank accounts is not fraudulent or counterfeit in any way. Agent Fagan also testified that, as far as he knew, Defendant made no attempt to flee when arrested and did not possess any contraband when arrested, other than the fictitious Lithuanian identification in a false name. Agent Fagan was not aware of any evidence showing the false Lithuanian identification was used to further the conspiracy. He also did not know when Defendant moved to Florida, or whether Defendant was made aware that charges were pending against him in New York. Agent Fagan believed Defendant's involvement in the fraudulent scheme ended in 2016, and he was not aware of any acts committed by Defendant in furtherance of the conspiracy since Defendant moved to Florida.

---

[2] Defense counsel introduced Defense Exhibit 2, which is a bank record from Wells Fargo for a business account in the name of Gortion Corporation, opened by ALEKSANDRS MUKANS.

11. Defense counsel asked Agent Fagan about the ATM video surveillance photograph discussed by the government in the proffer. To maintain a clear record, Defense counsel introduced the photograph as Defense Exhibit 1. Agent Fagan testified that the photograph depicts another co-conspirator making a withdrawal of fraudulently obtained funds from the co-conspirator's account. The photograph shows that Defendant was with the co-conspirator during the withdrawal. The photograph does not depict Defendant making any fraudulent withdrawals related to the case. Agent Fagan has not reviewed any surveillance video or photographs showing Defendant himself withdrawing fraudulently obtained money.

12. Next, the government proffered information from FBI Special Agent Gavin Gumbinner and FBI Task Force Officer John Grimmich, both of whom were present in Court. According to the government's attorney, Agent Gumbinner spoke to a source at the hotel where Defendant worked and resided. The source stated that Defendant told the source that Defendant was under investigation and had possibly been charged for fraud. FBI TFO Grimmich transported Defendant after his arrest. During transport, Defendant asked how much time he was looking at. Agents responded that it depended on how much fraud Defendant had committed. Defendant replied that he was only involved in about $85,000. The government argued that this information demonstrated that Defendant was in fact aware charges pending against him for fraud. Defense counsel declined to cross examine these witnesses.

13. The Defendant presented no witnesses or evidence at the hearing, and made no argument as to removal/identity. Regarding detention, defense counsel argued that Defendant is not a risk of flight because his involvement in the fraud was minor and ended in 2016. Defense counsel argued that Defendant came to the United States under his real name, and opened the bank accounts under his real name using his real identity. Defense counsel pointed out that there

was no evidence Defendant actually used the false Lithuanian identification. Further, Defendant did not make any attempt to flee when arrested and his sentencing guidelines are relatively low given that he is a minor participant.

14. Regarding the identity/removal issue, counsel for the government argued that the Latvian passport found in Defendant's pocket when he was arrested is the same passport Defendant used to open a personal bank account at Chase. The account at Chase was then used to open the business account in the name of Gortion Corporation and receive fraudulently obtained funds. With respect to detention, the government argued that Defendant is a risk of flight. The government pointed out that Defendant is from Latvia, which is a visa waiver country, meaning that while visitors from Latvia do not need a physical visa to enter the United States, they may only stay for 90 days. Defendant has been in the United States since January 2016, and has significantly overstayed the 90 days allowed. As a result, Defendant is not legally present in the United States. Further, defendant does not have ties to the United States – his mother, children and children's mother all live in Latvia. Lastly, Defendant possessed a Lithuanian identification document in a false name and date of birth when he was arrested. Based on these factors, the government argued that no condition or combination of conditions would reasonably assure the appearance of Defendant in the Southern District of New York.

15. This Court finds that the government presented sufficient evidence from Agent Fagan's testimony and the bank records and identification documents admitted into evidence at this hearing to establish that this Defendant is in fact the person who is named in the Superseding Indictment presently pending in the U.S. District Court for the Southern District of New York and who is named in the Warrant associated with that Superseding Indictment. This Court reviewed the passport found in Defendant's pocket at his arrest, and observed that the passport

photograph depicts the Defendant. This Court also reviewed the bank records and noted that Defendant's passport was used to open bank accounts that received fraudulent funds. This evidence satisfies this Court that the Defendant is the person named in the Superseding Indictment and shall be removed to the Southern District of New York.

It is therefore

**ORDERED AND ADJUDGED** that this Court finds that the Defendant is in fact the individual named in the Superseding Indictment and Warrant issued out of the U.S. District Court for the Southern District of New York in this matter and shall be REMOVED to the District Court for the Southern District of New York by the United States Marshal pursuant to this Court's Warrant of Removal.

**DONE and ORDERED** in Chambers at Fort Pierce, in the Southern District of Florida, this __23rd__ day of August, 2017.

                                                                         SHANIEK M. MAYNARD
                                                                         UNITED STATES MAGISTRATE JUDGE

Copies furnished:
AUSA Marton Gyires
AFPD Fletcher Peacock
U.S. Pretrial Services
U.S. Marshal